STATE of North Dakota, Plaintiff and Appellant,

v.

Jeffrey ZEARLEY, Defendant and Appellee.

Cr. No. 880322.

Supreme Court of North Dakota.

July 18, 1989.

Brian David Grosinger (argued), Asst. State's Atty., Mandan, for plaintiff and appellant.

Feldner & Danielson, Mandan, for defendant and appellee; argued by Rodney K. Feldner.

MESCHKE, Justice.

The State appealed from an order suppressing evidence of possession of a controlled substance. The evidence was discovered during a patdown and pocket search of a guest in a home being lawfully searched for drugs pursuant to a no-knock warrant. We reverse and remand for reconsideration.

Drug Enforcement agent Maixner and a team of Mandan police officers searched the Metzner home for drugs and related items. The no-knock search warrant did not reach other persons or property. While the other officers were at the front door with the warrant, Maixner knocked and entered the kitchen door. He identified himself to Penny Metzner but she attempted to stop Maixner from entering the hallway to the rest of the home. Metzner shouted, "Jeff, the police are here to search the house."

In the living room, Jeff Zearley heard shouting and went to see what the trouble was, though he testified that he did not understand what was shouted. Maixner, not knowing who "Jeff" was nor how many people were in the house, entered the hallway alone. There he met Zearley. Zearley attempted to block Maixner's way and they had a brief "pushing match." Maixner was in plain clothes without a badge, did not have the warrant, and did not identify himself to Zearley until after the pushing match. Maixner testified Zearley's manner was hostile. Maixner pushed Zearley against the wall until the other officers got to the hallway. Zearley claimed that he did not realize Maixner was an agent until he saw the other officers.

Maixner then patted Zearley down for weapons. Feeling a two-inch-long pipe and a one and one-half inch square key ring ornament in Zearley's pocket, Maixner reached into the pocket and pulled out a drug pipe and packets of methamphetamine. Maixner later testified that he "expected" the pipe to be a knife.

Charged with possession of a controlled substance, Zearley moved to suppress the evidence. The trial court ruled that the pipe and the packets of methamphetamine were inadmissible because the search contravened the Fourth Amendment and Article 1, § 8 of the North Dakota Constitution on reasonable searches and seizures:

> "There is nothing in the record to establish that the Defendant was aware that Maixner was a law enforcement agent. Maixner did not identify himself to Defendant until after the pat-down search and seizure of the items in Defendant's pockets. It is reasonable to determine that Defendant did not understand Penny Metzner's exclamation. Under the circumstances in this case, Maixner should not have reasonably believed Defendant was carrying a concealed weapon.
>
> "The search warrant covered the search of the Metzner residence only. There was no articulable basis for searching the Defendant."

The State appealed, contending that the patdown was a reasonable frisk for weapons and that the pocket search was reasonable to determine if the pipe was a knife. Zearley countered that Maixner lacked reasonable cause for suspicion that Zearley was armed and dangerous and that Maixner lacked reasonable grounds to believe that Zearley's pocket contained a weapon. We reverse and remand for reconsideration.

## PATDOWN

In *State v. Grant*, 361 N.W.2d 243 (N.D. 1985), police, with a warrant, were searching a house when Grant entered with the owner. An officer questioned Grant for a few minutes and requested to see her purse, telling her that she had no choice in the matter. Grant was charged with possession of marijuana, but the trial court granted her motion to suppress the evidence found in her purse. This court ruled that the State's appeal was untimely and ineffective. Nevertheless, this court went on to point out that the search of Grant's purse was not based on a reasonable belief that she was armed, quoting *Terry, infra, Ybarra, infra,* and *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). *Grant,* at 245. In *Grant,* we rejected the idea that officers executing a search warrant may routinely frisk for weapons anyone present at the scene of a valid search, but we did not foreclose a patdown search for weapons where circumstances created any valid concern for safety.

In limited circumstances, police may stop and pat down an individual, checking for weapons without probable cause to arrest. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967). The United States Supreme Court held that "stop and frisk" procedures were searches and seizures protected by the Fourth Amendment. *Id.,* at 16–17, 88 S.Ct. at 1877–78. The Court focused on the governmental interest in protecting officers and citizens and on the reasonableness of the action. *Id.,* at 23–24, 88 S.Ct. at 1881–82. The Court ruled that a "Terry stop" was permissible

but, mindful of the intrusive nature of a stop and patdown, narrowly tailored the ruling:

> "We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ... where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing ... serves to dispel his reasonable fear for his own or others' safety, he is entitled ... to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons...." *Id.*, at 30, 88 S.Ct. at 1884–85.

Where a stop of a person without a warrant is justified, "a carefully limited search of the outer clothing" for potential weapons is permissible for safety reasons. Reasoning from *Terry*, we readily conclude that Maixner's patdown of Zearley was justifiable.

■ In a remarkably similar case, a California appellate court arrived at a similar conclusion. *People v. Thurman*, 209 Cal. App.3d 817, 257 Cal.Rptr. 517 (1989). In *Thurman* the appellant, relying on *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), claimed that there was no reason to believe he was armed and dangerous and therefore, under *Terry*, the search was unlawful. The California appellate court rejected that contention, stating:

> "We have no hesitation whatever in holding that Officer Azuar acted reasonably and prudently in conducting the pat search of appellant in the circumstances. Here, a neutral and detached magistrate had judicially approved a warranted search for evidence of drug trafficking at the private residence where appellant was found. The officers whose duty required them to execute the warranted search were thus well aware they were engaged in an undertaking fraught with the potential for sudden violence. They were necessarily cognizant of the very real threat that the occupants of the resi-

dence were within an environment where weapons are readily accessible and often hidden, nor could they discount the possibility that one or more of the individuals found inside were personally armed.

> "In this atmosphere Officer Azuar, a 10–year veteran of police work, came upon appellant, at close range, quietly seated on a sofa. That appellant's posture, at that moment, was non-threatening does not in any measure diminish the potential for sudden armed violence that his presence within the residence suggested. To require an officer to await an overt act of hostility, as appellant suggests, before attempting to neutralize the threat of physical harm which accompanies an occupant's presence in a probable drug trafficking residential locale, would be utter folly." *Thurman, supra*, 257 Cal.Rptr., at 519–520.

Relying on *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977), the California court concluded:

> "The brief, relatively private intrusion upon appellant's personal security pales in significance when balanced against the officer's need to protect himself and others from the documented potential for violence inherent in a judicially sanctioned search for narcotics in a private residence. The risk of approaching an occupant of a private residence which is the probable site of drug trafficking corresponds to, if not exceeds, '... the inordinate risk confronting an officer as he approaches a person seated in an automobile.'" *Thurman*, [257 Cal.Rptr.] at 520.

In *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), based on an informant's statements, police obtained a warrant to search a bar and the bartender for evidence of possession of illegal drugs. Upon entering the bar, the police announced that they were going to conduct a "cursory search for weapons," authorized by an Illinois statute. *Id.*, at 88–89, 100 S.Ct. at 340–41. The officer removed nothing from Ybarra's pocket during the initial patdown. After everyone in the bar had been patted down, the officer returned to

Ybarra and removed a packet of heroin from his pocket. The trial court denied Ybarra's motion to suppress the heroin and Ybarra was convicted of its possession. After Illinois appellate courts upheld the conviction, Ybarra appealed to the United States Supreme Court, which reversed and remanded.

The Court found that the police had no probable cause to search Ybarra because patrons were not included in the warrant and because Ybarra gave them no indication of criminal activity. *Id.*, at 90–91, 100 S.Ct. at 341–42. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.*, at 91, 100 S.Ct. at 342. The Court held that a search must be supported by "probable cause particularized with respect to that person." *Id.* Presence at premises covered by a search warrant is not sufficient. *Id.* The patdown of Ybarra was not justified because it was "not supported by a reasonable belief" that he was armed and dangerous. *Id.*, at 92, 100 S.Ct. at 342–43. The Court reminded police that *Terry* created a very narrow exception to the probable cause requirement:

"Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." *Id.*, at 93–94, 88 S.Ct. at 343.

As do we, the *Thurman* court distinguished *Ybarra:*

"Unlike a business open to the general public, a private residence does not attract casual visitors off the street. When the private residence has been judicially determined as the probable site of narcotic transactions, the occupants are very likely to be involved in drug trafficking in one form or another. Moreover, because of the private nature of the surroundings and the recognized propensity of persons 'engaged in selling narcotics [to] frequently carry firearms to protect themselves from would-be robbers,' (*People v. Lee* (1987) 194 Cal. App.3d 975, 983, 240 Cal.Rptr. 32) the likelihood that the occupants are armed

or have ready accessibility to hidden weapons is conspicuously greater than in cases where, as in *Ybarra*, the public freely enters premises where legal business is transacted." *Thurman, supra,* 257 Cal.Rptr., at 520.

We conclude that Maixner's patdown of Zearley was a reasonable search for safety reasons. Therefore, the trial court's analysis of the reasonableness of the patdown was mistaken.

## POCKET SEARCH

While a patdown may often be reasonable for safety, the following pocket search must also be based on the same safety reasons. They are distinct efforts. To proceed without a warrant or an arrest, each must be reasonable.

In *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), a police officer observed Sibron talking with several known addicts over a period of eight hours. The officer knew nothing about Sibron, did not overhear any of the conversations, and did not see anything change hands. While Sibron was eating in a restaurant where he had been seen talking to addicts, the officer approached him and ordered him outside. Once outside, the officer said, "You know what I am after." Sibron reached into his pocket and the officer immediately thrust his hand into the same pocket, seizing several packets of heroin. Sibron's motion to suppress the heroin was denied, and Sibron pled guilty, while preserving his right to appeal. *Id.*, at 45, 88 S.Ct. at 1893–94. After New York appellate courts affirmed his conviction, Sibron appealed to the United States Supreme Court. The Court reversed and remanded, ruling that the heroin was illegally seized.

Because the officer had no probable cause to arrest Sibron for his unknown conversations with known addicts, the pocket search of Sibron was not incident to a lawful arrest. *Id.*, at 63, 88 S.Ct. at 1902–03. The Court did not view it as an acceptable "Terry stop" because the officer was unable "to point to particular facts from which he reasonably inferred that the

individual was armed and dangerous." *Id.,* at 64, 88 S.Ct. at 1903. Even if the officer had reasonable grounds for a patdown, this was an unacceptable explanation because there was no patdown before the search of the pocket and because the pocket search was not reasonably limited to the accomplishments of a limited patdown purpose. *Id.,* at 65, 88 S.Ct. at 1904. *Sibron* instructs that an articulable and reasonable suspicion about safety or weapons must underlie a pocket search without a warrant.

■ *Thurman, supra,* too, viewed the pocket search as an event distinct from the preceding patdown. In *Thurman,* the trial court denied the motion to suppress. The appellate court looked separately at the patdown and at the pocket search. That patdown for weapons was also motivated by reasons of safety and detected an unidentified "large bulge" in the subject's jacket pocket. The officer reached into the pocket. The appellate court characterized that as a "reasonable and limited component of the pat search." The California appellate court held "that where an outside clothing pat search reveals the presence of an object of a size and density that reasonably suggests the object might be a weapon, the searching officer is entitled to continue the search to the inner garments where the object is located in order to determine whether the object is in fact a weapon." 257 Cal.Rptr., at 521. We concur with this ruling.

The California appellate court explained: "Weapon verification is essential if safety is to be preserved and a potentially volatile situation neutralized. We cannot impose a condition of certainty that the object is a weapon before allowing an officer to continue the pat search to the inner clothing site where the object is located. To do so would frustrate the objective of the pat search. We can impose a condition that an officer's belief that the object is a weapon be reasonably grounded and not a mere subterfuge for a random search." *Id.*

The court concluded that condition had been met, that "simultaneous with the verification that the object was not a weapon occurred the realization that the objects were pieces of rock cocaine contained in a baggie" based on that officer's experience, and that this "tactile equivalent" of contraband in plain view justified completion of the pocket search.

We are less certain about the "tactile" perceptions of this officer. Maixner testified:

"Q. Now the objects that you removed from his pockets other than the keys, I believe you said a pipe was how long?

"A. Two inches.

"Q. And the object attached to the key chain was an inch and a half I believe that you testified to?

"A. Yes.

"Q. What type of weapons did you believe these to be?

"A. I expected to pull out a knife.

"Q. A knife with a two inch blade and a two inch handle assuming that it opened like a jackknife?

"A. With all of the items in the pocket there was a bulge there, I expected to pull out a knife. The pipe was on top of the items so that would have been on the outside, the pipe is what I felt.

"Q. What dimensions did you believe the knife would be before you actually saw the objects, from the feel of it what did you think?

"A. I didn't think about what size of knife it would be.

"Q. Are you saying that you believed, that whatever pocket knife that Mr. Zearley had in his pocket, constituted some threat to you?

"A. Yes."

Zearley testified:

"Q. What was in your pocket at the time that Officer Maixner patted you down?

"A. There was that little pipe and my keys and a paper folded up and then I had some money in my pocket, about eighty dollars I think that it was.

"Q. Did you have anything in your pocket that would feel like a weapon?

"A. Not that I can think of."

■ It is not clear whether the trial court's ruled on the reasonableness of Maixner completing a search of Zearley's pocket. The trial court said:

"Under the circumstances in this case, Maixner should not have reasonably believed Defendant was carrying a concealed weapon."

Whether this was a continuation of the trial court's mistaken analysis of the reasonableness of the patdown or was a separate finding on the reasonableness of the following pocket search is not clear to us.

The trial court had the opportunity to hear and observe the witnesses and to examine the pipe and key ring in assessing the reasonableness of the officer's search. In a suppression matter, we ordinarily recognize the importance of the trial court's opportunity to assess the credibility of witnesses by according deference to its decision. *State v. Thordarson*, 440 N.W.2d 510 (N.D.1989). But, where we are unable to understand its decision, we cannot defer to it.

■ In a tense situation like this confrontation, the officer may not be able to adequately and quickly access the hazards before a patdown. That is why we conclude that the patdown was reasonable. But the reasonableness of a patdown, without more, does not make a pocket search reasonable. A patdown is not simply a routine preliminary to a more extensive search. Before going further, the officer must have an articulable and reasonable suspicion that the person is armed and dangerous. On remand, the trial court must determine whether the pocket search following this patdown was reasonable.

We reverse and remand for reconsideration of the suppression order in accordance with this opinion.

ERICKSTAD, C.J., and MESCHKE, LEVINE, VANDE WALLE and GIERKE, JJ., concur.