Frederick Ricardo GERMANY,
Appellant,

v.

UNITED STATES, Appellee.

No. 08–CM–348.

District of Columbia Court of Appeals.

Argued May 28, 2009.
Decided Dec. 3, 2009.

Tonya L. Fleming, appointed by the court, for appellant.

Suzanne C. Nyland, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Assistant United States Attorney, were on the brief, for appellee.

Before THOMPSON, Associate Judge, and TERRY and SCHWELB, Senior Judges.

THOMPSON, Associate Judge:

After a bench trial, appellant Frederick Ricardo Germany was convicted of unlawful possession of a controlled substance (cocaine), *see* D.C.Code § 48–904.01(d) (2001), the court having denied his motion to suppress the tangible evidence. The evidence was found by a Metropolitan Police Department ("MPD") officer who frisked appellant for weapons when officers found him on the front porch of a house where officers had arrived to execute a premises search warrant. Appellant seeks reversal of his conviction on the ground that the pat-down search violated his rights under the Fourth Amendment. We conclude that the trial court did not err in denying the suppression motion, and we therefore affirm the judgment of conviction.

## I.

On November 1, 2007, MPD Detective Kevin Copeland obtained a search warrant that authorized a search of a suspected "crack house," a private residence located in the 5000 block of Bass Place, S.E. The warrant authorized a search for, *inter alia,* "crack cocaine, narcotics paraphernalia, ... firearms [and] weapons...." The affidavit submitted in support of the application for the search warrant, which the court admitted into evidence at the suppression hearing, contained the following factual background:

> [Confidential Source # 1 ("CS# 1")] was provided with an amount of advance [MPD] funds and instructed to attempt to purchase illicit drugs from within the [Bass Place, S.E., house]. While under law enforcement constant observation,

CS# 1 walked to the front door of [the house] and was met by a black female who was sitting on the front of the porch, the black female escorted CS# 1 inside.... A short time later CS# 1 exited the premises and responded directly to the Affiant [Detective Copeland] ... CS# 1 delivered several clear ziplocks containing a white rocklike substance to the Affiant, a portion of which subsequently field-tested positive for cocaine. CS# 1 stated that (IT) had purchased the white rocks from a black female inside of [the house].

At the suppression hearing, two MPD officers described the execution of the search warrant. Detective Copeland testified that after dark on November 2, 2007, around 8 p.m., "maybe about ten" MPD officers, wearing police vests, arrived at the house to execute the warrant. The door to the house was "already open" and Detective Copeland "could see that everybody was pretty much outside on the porch." More specifically, Detective Copeland testified, there were approximately seven people on the porch, including appellant, and two children and one female adult were inside the house. Police placed each of the people on the porch in "flexicuffs" (plastic handcuffs) "for the officers' safety and security."[1]

Detective Copeland acknowledged that when appellant was "handcuffed and placed on his stomach face down on the porch," police "had no indication that [appellant] was involved in any illegal activity" and no information that he was an owner or occupant of the house. In response to defense questioning, Detective Copeland testified that he did not know whether appellant had money in his hand

when police arrived on the scene. He agreed that "the only connection [appellant] had to this search warrant was he was on the porch with other people when officers arrived to execute the warrant." The entire search took about thirty-five to forty-five minutes.

Detective Lorenzo James was one of several officers present to assist with the search warrant. He testified that when MPD officers arrived on the scene, it was dark and there were "a lot of people on the front porch." Detective James was "outside with some of the other detectives, detaining people that [were] on the porch." Approximately six people were on the porch. "[E]verybody ... on the porch was instructed to get down" on the porch. Everyone complied, and then they all were "placed in flexicuffs or handcuffs for officers' safety and their safety while [police] were executing the warrant." Police then did a "safety patdown" of everyone on the porch, including appellant, who was lying on his stomach. When Detective James, who had his gun drawn, performed a patdown of appellant, the detective felt, in appellant's right front pants pocket, what he could tell (from the shape and from his years of experience in narcotics) was a four-or five-inch-long crack pipe. When Detective James rolled appellant over to complete the pat-down, "a plastic bag that contained white powder substance ... fell out of" the right pocket of appellant's jacket, which the detective described as a "waist-length coat." Detective James retrieved the crack pipe when he rolled appellant over, but stated that he "would have still rolled [appellant] over even if [the crack pipe] wasn't on him" because otherwise he could not do the "full pat-

---

1. Detective Copeland explained, "So what we normally do is we secure the premises.... We have everybody get down ... onto the ground or to the floor or wherever they may be, stop wherever you are, get down for safety purposes for the detectives and the officers that are executing the search warrant."

down." Asked on cross-examination whether appellant had done anything to raise Detective James's suspicions "relative to everyone else that was there at the time," Detective James responded, "No ... [appellant] was real calm." Appellant was put in flexicuffs along with everyone else for "officers' safety, when [the officers are] executing a search warrant and that amount of people [is] at a location." Detective James had no indication that appellant was armed or dangerous when he arrived at the location, and had no information that appellant lived in or owned the house, but explained that "when we, as police officers, execute warrants, we tend to treat ... people to be there to be armed and dangerous, could be armed and dangerous." Detective James could not recall whether appellant had any money in his hand.

Appellant Germany was the sole witness for the defense at the suppression hearing. He testified that he was on the porch of a friend's house, along with about seven or eight other people, "hanging out," "drinking and things like that," and celebrating "somebody's birthday." The other people were "younger people," while appellant was 47 years old. Appellant stated that just as the police arrived, he had cash in his hand and was "getting ready to leave off the porch." When police told him to "freeze" and asked what he had in his hand, he told them that he had money in his hand because he was headed toward the ice cream truck that was in front of the house to buy some chicken wings. An officer who had his gun drawn (not Detective James) made him return to the porch. The owner of the house was at the ice cream truck, looking at what was happening to her house. The officer who made appellant return to the porch patted appellant down, though "not really good ... like he was patting for guns or weapons...." Detective James took the money from appellant's hand, counted it, and put it in appellant's left back pocket, then put plastic cuffs on appellant and told him to lie down on the porch.[2] Appellant testified that he "kept asking for the search warrant" and that Detective James came to pat appellant down again because appellant "was the one asking for the search warrant." Four or five officers put plastic cuffs on everyone, patted everyone down, and then made them all lie down on the porch. There was a girl next to appellant and a man next to her.[3] Police made the owner lie down on the actual ground and put "real" handcuffs on her. A woman and children were in the house; the police let them come out of the house and did not pat them down while they were on the porch.

The trial court incorporated the motions hearing testimony into the trial. At the conclusion of all the testimony, the trial court denied the motion to suppress and found appellant guilty of cocaine possession. The court specifically credited the testimony of Detective James and found that when police arrived to execute the search warrant, they saw a "small crowd" congregated at the front of the house, did not know "who is the host and who is the guest" or who resided there, and, seeing people wearing coats in which weapons could easily be concealed, patted everyone

---

**2.** At another point in his testimony, appellant stated, inconsistently, that he was "on the ground with money in [his] hand."

**3.** Appellant testified that when the officer patted him down and "saw that I didn't have any weapons, he laid me down. Then he went to the girl next to me and laid her down the same way. Then the guy next to her, he did him the same way."

down almost contemporaneously with handcuffing them, to ensure safety.

## II.

■■■■ Appellant argues that police lacked a reasonable, articulable suspicion that he was armed or dangerous, and that it therefore was constitutionally impermissible for Detective James to perform the pat-down search. Accordingly, appellant contends, the trial court erred in denying his motion to suppress the cocaine, which police would not have found but for the (allegedly) unlawful search. In reviewing a trial court's ruling on a motion to suppress tangible evidence, "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling." *In re T.H.*, 898 A.2d 908, 912 (D.C.2006) (citation omitted). "We must accept the trial judge's findings of evidentiary fact and his resolution of conflicting testimony," reviewing them only for clear error. *See Brown v. United States*, 590 A.2d 1008, 1020 (D.C.1991). However, we are not limited to considering the facts the court found at the conclusion of the suppression hearing; rather, "[i]n deciding whether the motion to suppress was properly denied, we may of course consider all of the evidence at the suppression hearing as well as the undisputed trial testimony." *Lewis v. United*

*States*, 594 A.2d 542, 543 n. 3, 546 (D.C. 1991) (taking into account Lewis's "undisputed testimony at the suppression hearing" in determining whether trial court erred in denying motion to suppress). Whether reasonable suspicion exists to justify a search is a mixed question of fact and law. *Brown*, 590 A.2d at 1020. And, ultimately, whether the trial court erred in denying appellant's motion to suppress tangible evidence is subject to *de novo* review. *Id.*

## III.

The parties agree that the MPD officers' detention of appellant during the execution of the search warrant was lawful, and that the sole issue presented is whether the weapons pat-down was constitutionally permissible. As one appellate court observed a few years ago, "[w]hether law enforcement officers may detain *and* pat-down persons encountered during the execution of a narcotics search warrant in a private home is far from settled." *State v. Howard*, No.2003–CA–0058, 2004 WL 1238275, at % 57 29, 2004 Ohio App. LEXIS 2256, at ¶ 29 (Ohio Ct.App. June 2, 2004) (italics added). That remains true today;[4] in particular, the Supreme Court has not directly addressed the question of whether, consistent with the Fourth

4. Many years ago, the U.S. Supreme Court declined to review a decision of the Wisconsin Supreme Court holding that police executing a search warrant for drugs in a private residence were justified in conducting a weapons frisk of all persons found on the premises. *See Guy v. Wisconsin*, 509 U.S. 914, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993) (denying *certiorari* with respect to *State v. Guy*, 172 Wis.2d 86, 492 N.W.2d 311 (1992)). The dissenting justices would have granted *certiorari* to resolve the conflict between state courts on this issue, citing, as state court decisions upholding "patdown searches of persons encountered during the execution of a narcotics

search warrant in a private residence," *State v. Alamont*, 577 A.2d 665, 667–68 (R.I.1990); *State v. Zearley*, 444 N.W.2d 353, 357 (N.D. 1989); and *People v. Thurman*, 209 Cal. App.3d 817, 257 Cal.Rptr. 517, 520 (1989); and also citing, as decisions holding that "a defendant's 'mere presence' at a private residence being searched pursuant to a search warrant cannot justify a frisk of the defendant's person," *State v. Broadnax*, 98 Wash.2d 289, 654 P.2d 96, 101 (1982), and *United States v. Harvey*, 897 F.2d 1300, 1304 n. 2 (5th Cir.1990). *Guy v. Wisconsin*, 509 U.S. at 914–15.

Amendment,[5] police may frisk the occupants of a private residence during the execution of a search warrant for narcotics and weapons. However, a number of decisions by the Supreme Court and this court provide useful guidance.

As established by *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it is constitutionally permissible for police officers to conduct a pat-down search if they have reasonable articulable suspicion that the person they have detained is armed and dangerous. To "justif[y] the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. The reasonableness of a search (or a seizure) must be "judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21–

22, 88 S.Ct. 1868 (citations and internal quotation marks omitted).[6] To apply this standard, "*Terry* compels us to evaluate the totality of the circumstances...." *Smith v. United States,* 558 A.2d 312, 314 (D.C.1989). To determine whether a search was reasonable in light of the totality of circumstances, we must "balanc[e] the need to search ... against the invasion ... the search ... entails." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868 (quoting *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

The progeny of *Terry* include a number of decisions in which the Supreme Court considered whether police may search or seize individuals who are on the premises that police are searching during the execution of a search warrant. Appellant relies primarily on the Court's opinion in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), which he contends requires us to hold that the pat-down search in issue here was unlawful.[7] In *Ybarra,*

---

**5.** The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.

**6.** We may determine the facts available to the officer on the basis of police officers' collective knowledge, *e.g.,* the facts available to other officers on the scene as well as those facts known to the officer who performed the search or seizure in question. *United States v. Wheeler,* 317 Fed.Appx. 298, 300 (4th Cir. 2008); *see also United States v. Rochelle,* No.1:05CR112, 2009 WL 382745, *5, 2009 U.S. Dist. LEXIS 10875, *16–17 (M.D.N.C. Feb. 12, 2009) ("The collective knowledge of the officers at the scene provided a reasonable basis to believe [appellant] was armed and dangerous, thus a pat-down frisk was justified").

**7.** We understand the pat-down frisk in issue here to be "the type of limited inspection discussed in *Terry* ... where an officer merely checks an individual for weapons, while not conducting a full search of that individual's

person." *Dashiell v. State,* 374 Md. 85, 821 A.2d 372, 377 n. 3 (2003). Professor LaFave distinguishes the limited patdown search permitted by *Terry*—"a carefully limited search of the outer clothing" of an individual in an effort to discover guns, knives or other weapons, for the protection of the police officer performing the frisk and others, *Terry,* 392 U.S. at 30, 88 S.Ct. 1868—from the more extensive post-arrest weapon search described at page 17 n. 13 of the *Terry* opinion. *See* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.6(a) (4th ed.2004). In footnote 13, the *Terry* Court quoted a passage from Priar & Martin, *Searching and Disarming Criminals,* 45 J.Crim. L.C. & P.S. 481 (1954), that described a search in which "[t]he officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet." *Terry,* 392 U.S. at 17 n. 13, 88 S.Ct. 1868. By contrast, Professor LaFave explains,

the Court considered whether police officers who entered a tavern to execute a search warrant for heroin violated Ybarra's Fourth Amendment rights when— conducting a " 'cursory search for weapons' " —they frisked the dozen or so patrons of the tavern, including Ybarra, on whom they found packets of heroin.[8] The Supreme Court noted that "[t]he search warrant complaint did not allege that the bar was frequented by persons illegally purchasing drugs" and "did not state that the informant had ever seen a patron of the tavern purchase drugs from [the bartender] or from any other person." *Id.* at 90, 100 S.Ct. 338. Further, the Court noted, law enforcement agents "knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Id.* at 91, 100 S.Ct. 338. The Court held that the patdown search of Ybarra did not "constitute[ ] a reasonable frisk for weapons under the *Terry* doctrine," be-

cause the frisk "was simply not supported by a reasonable belief that [Ybarra] was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons." *Id.* at 92–93, 100 S.Ct. 338. The Court explained:

> When the police entered the Aurora Tap Tavern on March 1, 1976, the lighting was sufficient for them to observe the customers. Upon seeing Ybarra, they neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening. At the suppression hearing, the most Agent Johnson could point to was that Ybarra was wearing a 3/4–length lumber jacket, clothing which the State admits could be

> The limited search permitted by *Terry* ... is to find weapons "for the assault of the police officer," not merely to find weapons; thus there is no reason to cover every square inch of the suspect's body. The need is only to find implements which could readily be grasped by the suspect during the brief face-to-face encounter, not to uncover items which are cleverly concealed and which could be brought out only with considerable delay and difficulty. By contrast, the on-the-scene search of a person who has been arrested and who is to be transported to the station (often unwatched in the rear of the police van) also frequently referred to as a "frisk," must be more extensive because the arrestee may well have an opportunity to get his hands on a carefully concealed weapon. The difference between the two situations is appreciated by the police, who normally pat down only around the armpits and pockets during a stopping for investigation but make a more detailed search after arrest.... If during a lawful pat-down an officer feels an object

which obviously is not a weapon, further "patting" of it is not permissible.

LaFave, *supra*, § 9.6 (4th ed.2004); *see Minnesota v. Dickerson*, 508 U.S. 366, 378, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (where officer performing weapons frisk determined that a lump in suspect's pocket was contraband only after " 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket,' " the officer "overstepped the bounds of the 'strictly circumscribed' search for weapons allowed under Terry"); *Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (upholding search where officer "did not conduct a general exploratory search for whatever evidence of criminal activity he might find").

8. *Id.* at 88, 88 S.Ct. 1868. The warrant authorized a search of the premises for controlled substances and related items and a search of "Greg," the tavern bartender, who was described in the warrant. *Id.* It did not specifically authorize a search for weapons.

expected on almost any tavern patron in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous. *Id.* at 93, 100 S.Ct. 338.

Appellant argues that his circumstances during the search of the house on Bass Place cannot be distinguished in any material way from the facts of *Ybarra.* He emphasizes the Supreme Court's statement in that case that the " 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Id.* at 94, 100 S.Ct. 338.

We are not persuaded by appellant's argument in reliance on *Ybarra.* Rather, we think denial of the motion to suppress was consistent with the Supreme Court's later decisions in *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Muehler v. Mena,* 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005); and *Los Angeles County v. Rettele,* 550 U.S. 609, 127 S.Ct. 1989, 167 L.Ed.2d 974 (2007). In those cases, each of which involved the execution of a warrant to search a private residence, the Court drew back somewhat from the requirement that there be suspicion "directed at the person" who suffers the intrusion before police may intrude on the rights of an individual found on the premises to be searched.

In *Summers,* as police officers arrived to execute a warrant authorizing them to search a house for narcotics, they encountered an individual (Summers) descending the front steps of the house. They detained Summers while they searched the premises, and, after finding narcotics in the house and determining that he owned the house, arrested and searched him and found heroin in his coat pocket. *Summers,* 452 U.S. at 693, 101 S.Ct. 2587. Summers moved to suppress the heroin as the product of an unlawful seizure. The Supreme Court held that it was lawful for police to require Summers to re-enter and remain in the house, because "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.ct. 2587. The Court recognized that although "no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* at 702, 101 S.ct. 2587. The Court reasoned that because "a neutral magistrate rather than an officer in the field ... made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of the home," the "connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 703–04, 101 S.Ct. 2587.

As the Court explained several years later in *Mena,* the rationale of *Summers* is that once a warrant for the search of a home is authorized and the warrant is being executed, "the character of the additional intrusion caused by detention [of the occupants of the home] is slight [while] the justifications for detention are substantial." 544 U.S. at 98, 125 S.Ct. 1465 (citing *Summers,* 452 U.S. at 703–04, 101 S.Ct. 2587). The Court also characterized *Summers* as standing for the principle that "[a]n officer's authority to detain incident to [execution of] a search [warrant] is cate-

gorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Id.* (quoting *Summers*, 452 U.S. at 705 n. 19, 101 S.Ct. 2587). Thus, in *Summers*, the Court "created a broad right for police officers to secure premises during a search warrant." *Dashiell*, 821 A.2d at 383.

In *Mena*, police investigating a gang-related, drive-by shooting obtained a search warrant for an address where they had reason to believe at least one member of the gang involved in the shooting resided. The warrant authorized a search of the house and premises for, among other things, deadly weapons. 544 U.S. at 95, 125 S.Ct. 1465. The team of agents who conducted the search detained Mena (whom they found asleep in her bedroom) and three other individuals found on the property for the two-to three-hour duration of the search. *Id.* at 93, 103, 125 S.Ct. 1465. The team handcuffed the detainees and took them into a converted garage on the premises, with one or two officers guarding them. While the detainees were allowed to move around the garage, they remained in handcuffs during the entire search. *Id.* at 96, 125 S.Ct. 1465. The Court held that the "officers' use of force in the form of handcuffs to effectuate [the] detention" was lawful "because the govern-

mental interests outweigh[ed] the marginal intrusion," even as to occupants not named in the warrant.[9] *Id.* at 99, 125 S.Ct. 1465. Further, the Court explained that the "need to detain multiple occupants made the use of handcuffs all the more reasonable" so as to "minimiz[e] the risk of harm to both officers and occupants." *Id.* at 100, 125 S.Ct. 1465.[10]

*Rettele* was a suit brought under 42 U.S.C. § 1983 on the basis of a search and seizure by members of the Los Angeles County Sheriff's department who had a warrant to search three named suspects, and two houses where police believed the suspects resided, for documents and computer files, in connection with a fraud and identity theft investigation. 550 U.S. at 609–10, 127 S.Ct. 1989. One of the suspects was known to have registered a handgun. *Id.* at 610, 127 S.Ct. 1989. While executing the search warrant at the first house, officers found in a bedroom two residents (Rettele and Sadler) who were of a different race from that of the suspects named in the warrant. *Id.* With their guns drawn, the officers ordered the (innocent) residents, who had been sleeping unclothed, out of bed and required them to stand naked for a few moments before allowing them to cover themselves. 550 U.S. at 609–11, 127 S.Ct. 1989. The

**9.** Police both frisked and handcuffed Mena, *see* 544 U.S. at 110, 125 S.Ct. 1465 (Stevens, J., concurring), but Mena challenged only the detention in handcuffs, not the frisk.

**10.** *See also id.* at 102, 10, 125 S.Ct. 1465 (Stevens, J., concurring) (agreeing that it "would be unreasonable to expect officers, who are entering what they believe to be a high risk situation, to spend the time necessary to determine whether Mena was a threat before they handcuffed her" and observing that "[w]here the detainees outnumber those supervising them, and this situation could not be remedied without diverting officers from an extensive, complex, and time-consuming

search, the continued use of handcuffs after the initial sweep may be justified. . . .").

In *United States v. Sanchez*, 555 F.3d 910 (10th Cir.2009), the court interpreted the Supreme Court's references to "occupants" in *Summers* and *Mena* to include "anyone present on the premises, such as a visitor," noting that the Court did not explain "how officers are to determine whether a person on the premises is a resident." *Id.* at 918. The *Sanchez* court concluded that "[s]urely the officers are not bound to credit the person's representations on the matter. And the Court strongly indicates that specific facts implicating the occupant are not necessary. . . ." *Id.*

residents—who, police learned a few minutes into the search, had very recently purchased and moved into the house and were not connected to the suspects—contended that the officers were not entitled to qualified immunity because a reasonable officer "would have stopped the search upon discovering that respondents were of a different race than the suspects and because a reasonable deputy would not have ordered respondents from their bed." *Id.* at 610, 127 S.Ct. 1989.

The Court rejected the reasoning of the United States Court of Appeals for the Ninth Circuit that "[b]ecause respondents were of a different race than the suspects the deputies were seeking, ... '[a]fter taking one look at [respondents], the deputies should have realized that [respondents] were not the subjects of the search warrant and did not pose a threat to the deputies' safety.'" *Id.* at 613, 127 S.Ct. 1989 (quoting *Rettele v. Los Angeles County,* 186 Fed.Appx. 765, 766 (9th Cir.2006)). Rather, in a per curiam opinion, the Court reasoned:

> When the deputies ordered respondents from their bed, they had no way of knowing whether the African–American suspects were elsewhere in the house. The presence of some Caucasians in the residence did not eliminate the possibility that the suspects lived there as well. As the deputies stated in their affidavits, it is not uncommon in our society for people of different races to live together. Just as people of different races live and work together, so too might they engage in joint criminal activity. The deputies, who were searching a house where they believed a suspect might be armed, possessed authority to secure the premises

before deciding whether to continue with the search.

*Rettele,* 550 U.S. at 613, 127 S.Ct. 1989. The Court stated that the officers "were not required to turn their backs to allow Rettele and Sadler to retrieve clothing or to cover themselves with the sheets," notwithstanding the residents' "resulting frustration, embarrassment, and humiliation" (noting that there was "no allegation that the deputies prevented Sadler and Rettele from dressing longer than necessary to protect their safety"). *Id.* at 615, 616, 127 S.Ct. 1989. "Rather, '[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.'" *Id.* at 615, 127 S.Ct. 1989 (quoting *Summers,* 452 U.S. at 702–03, 101 S.Ct. 2587). Professor LaFave comments that, "Given the result in *Rettele,* it would seem likely that the Court would uphold a frisk absent any greater showing of danger from or involvement by the occupant subjected to the patdown." 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.9(d) (4th ed. Supp.2009–10).

Even before *Mena* and *Rettele,* this court recognized that, while the Supreme Court "has stressed the importance of 'individualized suspicion' as an essential prerequisite to a valid search or seizure" under the Fourth Amendment, "immediate safety concerns may justify police in stopping, or stopping and frisking, a person based on his association with someone else whom the police reasonably suspect of criminal activity." *Trice v. United States,* 849 A.2d 1002, 1006 (D.C.2004).[11] *Trice* did not involve the execution of a search

**11.** *See also* LaFave, *supra,* § 9.6(a) (4th ed. 2004) ("Yet another situation in which there may exist grounds for a frisk is when a policeman and citizen are brought into contact as a consequence of the officer acting to arrest (or otherwise detain) a companion of that person.").

warrant,[12] but *United States v. Owens,* 788 A.2d 570 (D.C.2002), did. We held in *Owens* that where police, who arrived at an apartment to execute a search warrant that authorized a search for firearms and ammunition, forcibly entered the apartment after their knock-and-announce went unanswered, they acted lawfully in removing the jacket worn by Owens, whom they found in the apartment, and patting it down for weapons. *Id.* at 577. We reasoned that "[e]specially once the police were refused admittance, they reasonably suspected—if not believed—that anyone inside the apartment was not a casual visitor but was associated with the drugs and firearms. At a minimum this justified the frisk of Owens' jacket, resulting in the seizure of the gun." *Id.* at 577 n. 7 (citation omitted).

 Thus, "despite the general rule" that requires suspicion directed at the person who suffers the intrusion, *Trice,* 849 A.2d at 1006, *Summers, Mena, Rettele,* and our own precedents point us toward a recognition that an individual's apparent association with a residence that police have been authorized to search for weapons is a circumstance that, along with the rest of the totality of circumstances, may provide a reasonable articulable basis for police to frisk the individual for weapons when they find him on the premises when they arrive to execute the search warrant.[13] As other courts as well have recognized, an individual's presence in a private residence that is being searched as a location from which illegal activities are being conducted is more likely, than an individual's presence in a business establishment that is open to the public, to indicate the individual's association with the illegal activities. In *Dashiell,* the Maryland Court of Appeals considered the lawfulness of a frisk for weapons that police performed in the course of executing a search at 9:00 p.m. at a private residence. Explaining its holding that the frisk was lawful, the court reasoned that "[p]resumably, all occupants of the home at that time were invited guests or residents, not random visitors whose identities were unknown to the residents. As such, the likelihood that those

---

**12.** The facts of *Trice* were that a detective heard a police dispatcher broadcast a lookout for a suspect in a stabbing at a nearby hospital. Shortly thereafter, the detective spotted two men, one of whom fit the description of the suspect and the other of whom was Trice, walking about a half-mile from the hospital. The detective stopped both men and ordered them to put their hands on the car to be frisked. This court upheld the detention and frisk, explaining that:

> Trice appeared to be the companion of a potentially violent, fleeing criminal and not a mere bystander. Moreover, given the recency of the crime, it was reasonable to think that if [the described suspect] committed it, his companion Trice likely was aware of the fact and was a witness if not also an accomplice or an accessory after the fact. On these facts it reasonably appeared that Trice posed a potential threat to an officer who was attempting lawfully to detain his friend on suspicion of a violent crime; for if Trice was not restrained, he might have tried to help [the suspect] resist arrest or retaliate against the officer.

*Trice, supra,* 849 A.2d at 1008. We had no occasion to decide in *Trice* whether "the same reasons that justified the stop also justified the frisk" because, when police were about to frisk Trice, they saw a silver object in his pocket that looked like a handgun. 849 A.2d at 1009. That gave police reasonable articulable suspicion that he was armed and dangerous. *Id.*

**13.** *Cf. United States v. Banks,* 628 F.Supp.2d 811, 817 (N.D.Ill.2009) (reasoning that it is a "logical extension" of the rule of *Summers* to permit a pat-down frisk of individuals who are within the "security perimeter" of an ongoing narcotics search and that it would be inconsistent with the "rule" of *Summers* "to forbid officers to perform a 'pat-down' frisk on individuals whom they encounter on the premises while executing a narcotics search warrant").

occupants knew of the drug trafficking operation occurring out of that household . . . was extremely high." 821 A.2d at 382. By contrast, the court reasoned, because the tavern in *Ybarra* "was open for business at the time of the warrant's execution, the likelihood that individuals with no knowledge or participation in the bartender's heroin trade were present was extremely high." *Id.; see also United States v. Reid,* 997 F.2d 1576, 1579 (D.C.Cir.1993) ("There is more reason to suspect that an individual who is present in a private residence containing drugs is involved in illegal drug activity than someone who merely holds conversations with drug addicts in public places."); *Guy,* 172 Wis.2d 86, 492 N.W.2d 311 (reasoning that "[w]hen a magistrate has determined that a residence is the probable site of drug trafficking, the occupants of that residence are very likely to be involved in drug trafficking") (internal quotation marks and citation omitted).

The fact that the location being searched is a private residence also weighs heavily in the totality of circumstances as a reason that heightens the need for police to take safety precautions. "[O]ccupants or residents [of a private home] are likely to react adversely to the police entrance into their home." *Dashiell,* 821 A.2d at 382. Further, police officers have "an additional reason to be wary of possible dangers when executing a search warrant in a private residence," because an individual within a private residence "is usually more familiar and comfortable in those sur-

roundings, which puts the officers at a serious disadvantage," and because "an officer may not normally know where weapons may be hidden in a private home, while the occupant may easily ambush the officer by concealing potential dangerous weapons within arm's reach." *Id.; see also Guy,* 172 Wis.2d 86, 492 N.W.2d 311 (recognizing that "executing a search warrant in a home can be more dangerous than doing so in a public place" because "an officer has to deal with suspects on the suspects' own turf and can reasonably fear that persons found in the residence are presently armed or may have ready access to weapons") (citations omitted); *Jackson v. State,* 993 So.2d 45, 46, 47 (Ala.Crim. App.2007) (noting that defendant "hid a pistol in a flowerpot on his front porch" and later "retrieved the gun he had hidden on his front porch and began shooting at [the victim]").[14]

### IV.

 In this case, the warrant authorized police to search the Bass Place residence not only for narcotics, but also for weapons. Although police did not know whether appellant owned or resided in the house, they could reasonably assume that he was a resident or an invited guest when they found him—by his account, partying along with several other people—on the premises when they arrived to conduct the search. The trial court found a number of other facts that also are pertinent to the totality of circumstances that we must consider. According to Detective James's tes-

---

**14.** *See also* LaFave, *supra,* § 4.9(d) (4th ed.2004) (noting the greater likelihood of danger to police in a premises search warrant situation if the person does have a weapon because the person) " 'will certainly have much more opportunity to use [any such weapon] against the officer,' " than he would have in a *"Terry* type on-the-street confrontation," "not only because the suspect and offi-

cer will be in close proximity for a longer period of time, but also . . . because the officer's investigative responsibilities under the warrant require him to direct his attention to the premises rather than the person" (quoting *United States v. Robinson,* 414 U.S. 218, 253–54, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)) (Marshall, J., dissenting).

timony, which the trial court specifically credited, when police arrived, it was dark; there were multiple occupants on the porch (the same location where, according to the search warrant affidavit, the individual who sold cocaine to the confidential informant met her customer) and in the house; and appellant was wearing a coat under which a weapon could be concealed.[15] Furthermore, police used plastic "flexicuffs" to restrain the occupants of the porch whom they detained. Presumably, flexicuffs are not as secure as metal handcuffs, which themselves provide no guarantee that a restrained individual cannot reach places where contraband is secreted and endanger police.[16]

---

**15.** *Cf. Rettele,* 550 U.S. at 614, 127 S.Ct. 1989 (reasoning that the fact that "[b]lankets and bedding can conceal a weapon" was a factor that underscored the point that the "orders by the police to the occupants ... were permissible, and perhaps necessary, to protect the safety of the deputies.").

**16.** *See Sanders,* 994 F.2d at 209–10 ("The limitations of handcuffs' effectiveness are widely known to law enforcement personnel ... in 1991 alone (the most recent year for which statistics are available), at least four police officers were killed by persons who had already been handcuffed."); *Elliott v. City of Clarksville,* 2007 WL 470467, at *18, 2007 U.S. Dist. LEXIS 9616, at *53, *54 (M.D.Tenn. Feb. 9, 2007) (noting officer's testimony that, although suspect was face-down on the floor and handcuffed, "you would be foolish not to [frisk] an individual and make sure they [didn't have] guns," because officer "was aware of other situations in which individuals were able to reach weapons even when handcuffed."); *United States v. Jones,* 2006 WL 763124, at *5, 2006 U.S. Dist. LEXIS 13048, at *15 (D.Me. Mar. 24, 2006) (describing police officer's testimony that "handcuffed individuals have managed to slip out of handcuffs, hide contraband around their waists and even reach weapons."); *cf. Peters v. State,* 1994 WL 60883, at *1, 1994 Tex.App. LEXIS 3768, at *2 (Tex.App. Feb. 23, 1994) (noting that although appellant "was handcuffed with flexicuffs and placed in the van, lying face down," as officers were removing him from the van at the police station, they saw a bag of cocaine on the van floor within a few inches of where his right pocket had been); *State v. Dennis,* 2008 WL 2468579, at *1, 2008 Wash.App. LEXIS 1384, at *3 (Wash. Ct.App. June 16, 2008) (describing police officer's testimony that "I've seen people get into the back of their pants, because we handcuff in the back ... reach into the pants and retrieve narcotics from there and drop them on the ground."); *Fender v. State,* 74 P.3d 1220, 1229 n. 5 (Wyo.2003) (rejecting "the assumption that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm," and observing that "the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain" and that "it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself.") (quoting *United States v. Sanders,* 994 F.2d 200, 209 (5th Cir.1993)); *see also Sanders,* 994 F.2d at 209, 210 ("We are convinced that for the officers to frisk Sanders after he had already been handcuffed was not unreasonable under the circumstances ...." because if police had not frisked Sanders after handcuffing him, once they removed the handcuffs and released him, he "could have easily retrieved his pistol" and "the danger would return in full force....").

Courts have treated a frisk or pat-down as a precaution that logically accompanies the more intrusive step of handcuffing. *See United States v. Giangola,* No. CR 07–0706 JB, 2008 WL 6020505, 2008 U.S. Dist. LEXIS 108747 (D.N.M. July 24, 2008) ("[T]he officers' failure to conduct any frisk or search before they attempted to handcuff [defendant] suggests that any fear that [they] had that there were weapons lacked a reasonable foundation."); *Sanders,* 994 F.2d at 209 (removal of handcuffs without frisking would cause perceived danger to "return in full force"); *Womack,* 673 A.2d at 614 n. 25 (noting that the dissenting panel member, who would have held that the handcuffing was unlawful because police had no basis to suspect that Womack was dangerous, cited the fact "that the officers did not [even] frisk Womack before handcuffing him ...."); *see also* LaFave,

�andthe uncontradicted portions of appellant's testimony at the suppression hearing, though not specifically credited (or discredited) by the court, recited additional facts that, as part of the totality of circumstances, would have warranted an objective officer of reasonable caution in the belief that safety precautions were needed with respect to appellant in particular. Appellant testified that he was attempting to leave the porch as police arrived.[17] In addition, appellant testified that there were seven or eight people congregated on the porch, a number that exceeded the four or five officers who were attending to them.[18]

In light of all the foregoing, we conclude that the totality of circumstances gave the police a basis for reasonable, articulable suspicion that appellant might be armed and dangerous, and that police therefore acted lawfully in performing a pat-down frisk of appellant for weapons.[19] Accord-

---

*supra*, § 9.6 (4th ed. Supp.2009–10) ("An otherwise valid frisk is not objectionable because the suspect was first placed in handcuffs....").

**17.** *Cf. Howard v. United States*, 929 A.2d 839, 846 (D.C.2007) (" 'unprovoked flight upon noticing the police' ... may support reasonable, articulable suspicion") (citation omitted); *United States v. Hicks*, No. 3:08–CR–39, 2009 WL 1147918, at *3, 2009 U.S. Dist. LEXIS 36145, at *7 (E.D.Va. Apr. 27, 2009) ("It is reasonable to infer that individuals congregating in a private residence, having twice retreated collectively from the presence of the police, may be participating collectively in some illegal activity related to the contraband already seized on the premises").

**18.** Although Detective James did not testify that this was a concern, "in reviewing the validity of a subsequent search under *Terry*, the subjective thoughts of the officer are irrelevant because the test is an objective one." *In re D.A.D.*, 763 A.2d 1152, 1157 n. 7 (D.C.2000) (citing *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action") (internal quotations and citations omitted)).

**19.** We do not hold that, in every case, police may frisk all occupants of a residence being searched pursuant to a search warrant. As Professor LaFave aptly puts it, "it remains clear that there is no authority justifying the police to 'routinely' frisk those present at *any* search warrant execution." LaFave, *supra*,

§ 4.9(d) (4th ed. Supp.2009–10). Professor LaFave urges recognition of the rule that "not all stops call for a frisk" (notwithstanding the reasoning of some courts that police may automatically frisk in certain types of situations). LaFave, *supra*, § 9.6(a) (4th ed.2004) (citing David A. Harris, *Frisking Every Suspect: The Withering of Terry*, 28 U.C. Davis L.Rev. 1, 5 (1994)).

Other courts have reached the conclusion we reach on similar facts. *See, e.g., United States v. Proctor*, 148 F.3d 39, 42 (1st Cir. 1998) (upholding a police frisk of an individual approaching a private residence being searched pursuant to a valid narcotics warrant because it was reasonable to infer that the individual was involved in the drug trade and thus was dangerous); *United States v. Reid*, 997 F.2d 1576, 1579 (D.C.Cir.1993) (holding that police executing a search warrant on an apartment for narcotics acted lawfully in stopping Reid and frisking him for weapons when he exited the apartment to be searched, but declining to "extend *Summers* to hold that the police, when executing a narcotics search warrant, should be able to search everyone on the premises for weapons," reasoning that "were it not for the specific testimony of Officer Carter that he felt endangered by Reid's potential presence behind the police officers as they were seeking to execute the search warrant, the government could not prevail"); *People v. Thurman*, 209 Cal.App.3d 817, 257 Cal.Rptr. 517, 520 (1989) (upholding a protective frisk for weapons during the execution of a search warrant at a private residence where an officer frisked an individual who was not named in the warrant but was sitting quietly on a sofa in a nonthreatening manner, because the officers "were engaged in an undertaking fraught

ingly, we hold that the trial court did not err in denying the motion to suppress the cocaine that fell out of appellant's clothing during the frisk.

In reaching this result, we recognize that "even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry,* 392 U.S. at 24–

with the potential for sudden violence"); *State v. Trine,* 236 Conn. 216, 673 A.2d 1098, 1105 (1996) (reasoning that where police officer "knew that the magistrate who issued the search warrant had found probable cause to believe that weapons as well as narcotics were located" in the residence to be searched, this "specific finding by the magistrate bolstered [the police officer's] general awareness that narcotics traffickers are often armed," so that the officer "had a reasonable and articulable suspicion that the defendant [they encountered on the premises] might have been armed and dangerous"); *Condon v. State,* 203 Ga.App. 163, 416 S.E.2d 802, 802–03 (1992) (validating a *Terry* frisk where an individual was frisked after he drove his truck onto the premises of the residence being searched pursuant to a valid narcotics warrant, even though the individual was not named in warrant and was not a resident of the premises); *State v. Kester,* 137 Idaho 643, 51 P.3d 457, 461 (2002) (holding that police had a reasonable suspicion to believe the defendant posed a danger sufficient to justify a protective frisk when officers executed a search warrant for narcotics and weapons at 11 p.m. and frisked the defendant as he approached the house being searched); *State v. Taylor,* 82 Ohio App.3d 434, 612 N.E.2d 728, 734 (1992) (upholding an officer's right to frisk an occupant of a residence suspected of being a crack house during a search pursuant to a valid warrant, although there was no specific danger other than the relationship between weapons and drugs); *Commonwealth v. Patterson,* 405 Pa.Super. 17, 591 A.2d 1075, 1078–79 (1991) (allowing the frisk of an individual approaching a known crack house in the early morning due to the significant danger the man presented because of the close relationship between guns and drugs); *State v. Peguero,* 652 A.2d 972, 974 (R.I.1995) (reasoning that the defendant's presence in the private residence being searched pursuant to a warrant that authorized a search for cocaine "justified a pat-down search for weapons," notwithstanding the fact that the defendant was not the owner of the apartment); *State v. Curtis,* 964 S.W.2d 604, 614 (Tenn. Crim.App.1997) (allowing a frisk for weapons of an individual about to enter residence as police arrived to execute a search warrant for

drugs because of the fact that weapons are often carried by those engaged in illegal drug trafficking); *cf. Dashiell,* 821 A.2d at 375, 376, 381 n. 4 (holding that officers executing a search warrant on a residence had sufficient reasonable articulable suspicion to pat down all the individuals in the house, including Dashiell for weapons, even though police had no particularized suspicion that Dashiell herself, was armed and dangerous, but emphasizing that the specific information presented to the judge to obtain the search warrant was that an informant named in the affidavit had reported to police that he saw several firearms within the residence and had observed one of the residents with a handgun, and cautioning that police officers' testimony that "their training and experience gave them the knowledge that persons involved with the distribution of illegal drugs ... 'carry all types of weapons which puts the officers in danger during the execution of search and seizure warrants' " by itself would not have provided the requisite particularized suspicion); *Murphy v. Commonwealth,* 264 Va. 568, 570 S.E.2d 836, 839 (2002) ("[W]e will assume, without deciding, that the execution of the search warrant for the [residence] permitted Officer Harvey to conduct a 'pat down' search of Murphy to determine whether he carried a concealed weapon"). *But see United States v. Cole,* 628 F.2d 897, 899 (5th Cir.1980) (holding that officer's pat-down of appellant as he exited his truck outside his duplex apartment building "cannot be justified by appellant's mere presence on the premises during the execution of the warrant" for amphetamines); *State v. Vandiver,* 257 Kan. 53, 891 P.2d 350, 357–58 (1995) (holding that police executing search warrant of residence for controlled substances and firearms could not lawfully search everyone on premises and noting that "[t]here is nothing to indicate that the officer was concerned with his safety").

In *United States v. Sporleder,* 635 F.2d 809 (10th Cir.1980), a case on which appellant relies, the court held that police lacked a reasonable articulable suspicion to frisk an individual while executing a search warrant for narcotics not in a private residence, but at "a fake radio shop at the subject location." *Id.* at 811, 814.

25, 88 S.Ct. 1868. We are not persuaded, however, that the pat-down frisk in issue here rendered the intrusion in this case, during the thirty-five-to forty-five-minute period while appellant was detained and handcuffed, significantly more intrusive or any less reasonable than the protracted (two-to three-hour) intrusion the Supreme Court held to be lawful in *Mena* or the embarrassing circumstances that the Court held did not make the seizure in *Rettele* unreasonable. And, balanced against this intrusion is the strong governmental interest in minimizing the risk of harm to both officers and occupants of the premises being searched, a governmental interest that approaches its "maximum when [as here] a warrant authorizes a search for weapons...." *Mena,* 544 U.S. at 99–100, 125 S.Ct. 1465. We note that in *United States v. Michelletti,* 13 F.3d 838 (5th Cir.1994), the court observed that "[t]he number of police officers killed annually in the line of duty has tripled since *Terry* was decided; the numbers of those assaulted and wounded have risen by a factor of twenty. Surely the constitutional legitimacy of a brief patdown ... should reflect the horrendously more violent society in which we live, twenty-five years after *Terry.*" *Michelletti,* 13 F.3d at 844; *see also State v. McGill,* 234 Wis.2d 560, 609 N.W.2d 795, 800–01 (2000) (observing that "[t]he need for officers to frisk for weapons is even more compelling today

than it was at the time of *Terry,*" and citing an FBI report indicating that "[a]lthough the number of officers killed in the line of duty has increased only slightly [since 1966] ... the number of assaults on officers has more than doubled....."). As we emphasized in *Trice,* "we routinely expect police officers to risk their lives.... We should not bicker if in bringing potentially dangerous situations under control[,] they ... take precautions which reasonable men are warranted in taking." *Trice,* 849 A.2d at 1007–08 (citation omitted).[20]

The judgment of conviction is

*Affirmed.*

---

**20.** We agree with the Maryland Court of Appeals's observation in *Dashiell:*

> A policy of conducting frisks in narrow circumstances, such as in the case at bar, may help ensure the safety of the occupants as well as the officers. An officer who believes there may be weapons inside a house that is going to be entered under a warrant will be, and rightfully so, on high alert. Any sudden movement by any occupant might elicit a quick reaction from the officer, including, perhaps, the drawing of the officer's firearm. Such a situation is potentially dangerous to the residents and the officer. That danger may, we believe, in part, be lessened after the officer is able to check each occupant for weapons the

officer has reason to believe might be somewhere on the premises.

*Dashiell,* 821 A.2d at 383 n. 6.