*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-1077

MICHAEL BINGMAN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-9017-18)

(Hon. Judith A. Smith, Trial Judge)

(Submitted November 24, 2020                    Decided January 27, 2022)

*Michael Bruckheim* for appellant.

*Andrea Antonelli*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time the brief was filed, *Elizabeth Trosman*, *John P. Mannarino*, *and Elizabeth Aloi*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and FISHER, *Senior Judge*.

Opinion of the court by *Associate Judge* EASTERLY.

Dissenting opinion by *Senior Judge* FISHER at page 12.

EASTERLY, *Associate Judge*:  Michael Bingman seeks reversal of a number of gun-related convictions,[1] arguing that, because he was subject to an illegal search and seizure, the trial court erroneously denied his motion to suppress.  Based on the testimony of two officers who participated in Mr. Bingman's arrest as well as the body-worn camera footage, the trial court concluded that the police lawfully seized Mr. Bingman and patted him down for weapons after they (1) went to execute a warrant at the location of a suspected marijuana "pop-up"[2] party and saw Mr. Bingman exiting the building, and (2) noticed that he was carrying what appeared to be a sheathed knife at his waistband.  While we generally defer to the trial court's fact-finding and review the evidence and reasonable inferences therefrom in the light most favorable to the suppression ruling, whether the police violated a defendant's rights under the Fourth Amendment is a legal question that we review de novo. *Hooks v. United States,* 208 A.3d 741, 745 (D.C. 2019).  It is "this court's obligation to ensure that the trial court had a substantial basis for concluding that no

---

[1] Carrying a pistol without a license (outside home or place of business), D.C. Code § 22-4504(a) (2021 Supp.); possession of an unregistered firearm, D.C. Code § 7-2502.01(a) (2018 Repl.); unlawful possession of ammunition, D.C. Code § 7-2506.01(a)(3) (2018 Repl.); and two counts of possession of a large capacity ammunition feeding device, D.C. Code § 7-2506.01(b).

[2] *Pop-up*, Merriam-Webster Dictionary (11th ed. 2020) ("[S]et up quickly for short-term operation in a temporary location.").

constitutional violation occurred." *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013) (internal quotation marks omitted).

The police did not have a warrant for Mr. Bingman's arrest. Nor did the warrant to search the location of the pop-up party give them the authority to arrest or search him. For the purposes of this opinion we assume, however, that, on the basis of the search warrant, the police had grounds to briefly detain him, *see Michigan v. Summers*, 452 U.S. 692, 703–04 (1981), and that his initial seizure did not amount to an arrest. Nevertheless, the act of searching Mr. Bingman for weapons must separately be justified upon a showing that under a totality of the circumstances the police reasonably believed he was armed and dangerous at the time of the search. *See id.* at 695 n.4 ("The seizure issue in this case should not be confused with the search issue presented in *Ybarra v. Illinois*, 444 U.S. 85 (1979)." (quotation marks omitted)); *see also Ybarra*, 444 U.S. at 92–93 (holding that a frisk of a person detained at the location where a search warrant was being executed had to be "supported by a reasonable belief that he was armed and presently dangerous, a belief which th[e Supreme] Court has invariably held must form the predicate to a patdown of a person for weapons"). The trial court never explicitly stated that it was analyzing the legality of Mr. Bingman's patdown under this standard. Assuming the court applied it, we conclude that the court erred in ruling that the government

presented sufficient evidence to support a determination that the police reasonably believed Mr. Bingman was armed and presently dangerous.

Relying on the officers' testimony, the trial court noted that the police executing the search warrant "clearly had some belief that there was some illegal activity going on" but also acknowledged that "the warrant was for the entire premises, not for any particular person." Moreover, the only illegal activity specified in the warrant was that the location was being used for the sale and possible consumption of marijuana and related paraphernalia (e.g. rolling papers). There was no indication in the warrant that the police had any reason, much less probable cause, to believe that there were any weapons on the premises. *Cf. Germany v. United States*, 984 A.2d 1217, 1227 (D.C. 2009) ("[A]n individual's apparent association *with a residence that police have been authorized to search for weapons*[3] is a

---

[3] In its brief to this court, the government relies on an altered quotation from *Germany* to support the proposition that, whenever a court issues a warrant for any sort of search of any particular location, that fact weighs in favor of concluding that an individual encountered at that location is armed and dangerous under a totality of circumstances analysis. Specifically, the government omits the italicized language above; it then fills in its own text, underlined below:

> "[a]n individual's apparent association" <u>with a location that police have been authorized to search</u> "[i]s a circumstance that, along with the totality of circumstances, may provide a reasonable articulable basis for police to frisk the individual for weapons when they find him on the

circumstance that, along with the rest of the totality of the circumstances, may provide a reasonable articulable basis for police to frisk the individual for weapons when they find him on the premises when they arrive to execute the search warrant." (emphasis added)).  The government argues that the officers' reasonable suspicion was supported by their testimony that "it's not uncommon" for the police to find weapons at marijuana pop-up events.  "[W]e know too little about [the officers'] experience to place much weight upon [their] conclusory statement[s]," however. *United States v. Taylor*, 49 A.3d 818, 827 (D.C. 2012) (internal quotation marks and citations omitted); *see also Hawkins v. United States*, 248 A.3d 125, 131 (D.C. 2021) (explaining that "officer's conclusory reference to a 'trend' of finding guns hidden in satchels that summer" is insufficient to justify the search).  One officer (quoted by the dissent, *post* at 14) could not recall whether he had personally been involved in any pop-up warrants prior to this one.  The other officer (also quoted by the dissent, *post* at 15) testified only vaguely that during "most" of the "few pop-up warrants" he had executed or was aware of (he did not specify), the police had

---

premises when they arrive to execute the search warrant." *Germany v. United States*, 984 A.2d 1217, 1227 (D.C. 2009).

Government's Brief at 16.  Not only is the government's proposition unsupported by *Germany* as written, it makes little sense.  Search warrants are issued in myriad circumstances, including ones involving nonviolent crime.

encountered security, and they had "found weapons" (where he did not specify) on "multiple occasions." Thus, the trial court appropriately did not make a finding of fact in the government's favor based on this testimony.[4]

Aside from Mr. Bingman's presence at a location to be searched for marijuana and related paraphernalia pursuant to a warrant, the trial court appeared to rely on the fact that Mr. Bingman was wearing a knife on his belt. The court concluded that the knife added to the calculus of reasonable articulable suspicion, even though the government presented no evidence that it was an illegal weapon or was being used as such. Notably, the government never charged Mr. Bingman with possession of the knife, sought to admit the knife or a photograph thereof as an exhibit, or presented testimony about the knife's appearance or size.[5] (Although the sheath for the knife is visible in the body-worn camera footage, the knife itself is not.). As we explained in *Maye v. United States,* 260 A.3d 638, 649 (D.C. 2021), because knives are useful tools for "open[ing] packages, break[ing] down boxes, or cut[ting]

---

[4] The dissent suggests that we can simply conclude as a matter of law that, whenever there is reason to believe drugs of any sort are present, there is reasonable articulable suspicion to believe guns are too. *Post* at 14. But the cases it cites do not support this reasoning; to the contrary, they reaffirm a totality of the particular factual circumstances analysis. *See Peay v. United States*, 597 A.2d 1318, 1320, 1323 (D.C. 1991) (en banc); *Stanley v. United States*, 6 A.3d 270, 275 (D.C. 2010).

[5] The dissent concedes that the record contains no information about the "shape or dimensions" of the knife. *Post* at 13 n.1.

strings," not all knives automatically "carr[y] with [them] an indicium of wrongdoing" or cause the individual in possession of such a tool to "forfeit[] their Fourth Amendment rights to be free from seizures and searches absent more particularized suspicion." *Id.* Accordingly, in this case, without more information, Mr. Bingman's in-plain-view possession of some sort of knife does not meaningfully contribute to an assessment of whether the police had reasonable articulable suspicion to believe he had a concealed weapon.[6]

As discussed, the factors the trial court relied upon to validate the patdown of Mr. Bingman—his presence at a site the police were authorized pursuant to a warrant

---

[6] The dissent argues that removing the openly carried knife from Mr. Bingman's possession "was an entirely reasonable precaution." *Post* at 14. But Mr. Bingman has not challenged the seizure of his knife. The dissent also argues that "the fact that [Mr. Bingman] was carrying and displaying *such a weapon* remains a part of the totality of the circumstances . . . that we must take in to account." *Post* at 14 (emphasis added) (internal quotation marks omitted). We do not disagree in principle that the open display of a weapon may factor into a reasonable articulable suspicion calculus to conduct a *Terry* patdown. But, unlike the dissent, we decline to reach the speculative conclusion that Mr. Bingman's in-plain-view possession of a knife (about which the government provided zero information) signified that he was armed with a concealed weapon. Lastly, unlike the dissent, *post* at 15, we decline to give weight to testimony from the police that once they found a knife of undescribed shape or size, "we definitely *had* to look for more weapons." (emphasis added). As we have previously explained, "[a] court may not simply rely on a police officer's conclusory assertions in deciding whether a search or seizure was justified under the Fourth Amendment, but rather must evaluate the facts underlying those assertions." *Parsons v. United States*, 15 A.3d 276, 280 (D.C. 2011) (internal quotation marks omitted).

to search for marijuana and marijuana paraphernalia, and his possession of a knife of unknown description—do not support a reasonable determination that he was armed and dangerous. The government argues, however, that under a totality of the circumstances analysis, we should consider other evidence in the record, namely the fact that the police officers believed Mr. Bingman was working as security for the marijuana pop-up party and the fact that there were other people in the vicinity.

The police testified that they suspected that Mr. Bingman was working security for the marijuana pop-up party, even though they acknowledged Mr. Bingman (1) was not wearing any badge or markings that indicated that he was working security for the event, (2) answered "no" when the police asked him whether he works at the location, (3) gave no other indication that "he was involved with whatever may have been happening inside," (4) was cordial as the police approached—extending his hand to greet them,[7] and (5) cooperated with the police

---

[7] The trial court observed that the officers might reasonably have thought "that Mr. Bingman could have been trying to delay [them] from going into the [building] where they were clearly heading." This inference seems strained if only because the location of the alleged pop-up party, a warehouse type building, had multiple entrances—at least two open loading docks and two open doorways are visible in the body-worn camera footage—and the officers never testified that Mr. Bingman was blocking their way into the building (nor does he appear to be doing so in the body-worn camera footage). In any event, this finding has no obvious bearing on whether Mr. Bingman was armed or dangerous.

when they directed him to walk down the stairs of the warehouse, immediately grabbed him, and put him in handcuffs. As the foundation for their suspicion, the officers relied on their unspecified "experience with [such] events," *but see supra,* and the fact that Mr. Bingman was wearing what they described as a "Battle Dress Uniform (BDU)," a "sort of a military-type uniform, security, law enforcement-related uniform." The trial court conspicuously did not find that Mr. Bingman was wearing a BDU, likely because this descriptor has no reasonable application to Mr. Bingman's outfit. Unlike, for example, the outfits worn by Gun Recovery Unit ("GRU") officers in a group photograph discussed and displayed in *Wonell Jones v. United States*, 263 A.3d 445, 450 (D.C. 2021), Mr. Bingman's clothing—a Rick and Morty T-shirt,[8] black pants "with the big pockets to store items in," and a black hooded vest with a skull drawn on its back—looks nothing like a "security, law enforcement-related uniform." We discern nothing inherently suspicious about wearing a graphic tee and cargo pants, especially when nothing else signals the wearer of the outfit is working as security.[9]

---

[8] Rick and Morty, https://www.adultswim.com/videos/rick-and-morty; https://perma.cc/F8SQ-64L3 (last visited Nov. 16, 2021).

[9] Implicitly conceding the inaptness of the BDU description, the dissent dismisses it as a "distraction." *Post* at 16. Instead, the dissent focuses on Mr. Bingman's decision to wear "baggy pants with capacious pockets," clothing it asserts that "would be useful for someone who was providing security . . . and wanted to have weapons readily accessible." *Id*. But again, there is no evidence in

Finally, the government argues that the officers "had legitimate safety concerns because of the number of people in the area." The trial court found that "there were about four people" present outside the building when the police arrived.[10] The fact that there were four individuals "milling about" outside when the police arrived (to whom the police paid little attention and appeared not to perceive as a threat before they spoke to Mr. Bingman), provides no foundation for their perception that Mr. Bingman was a particular threat. Likewise, the fact that "some bystanders" came over to film the police's interaction with Mr. Bingman, as one officer testified, does not support a logical inference that Mr. Bingman was armed and presently dangerous.

---

the record that Mr. Bingman *was* providing security, and many people choose to wear cargo pants because having pockets in one's clothing is generally useful. Indeed, perhaps for this reason, cargo pants have become a fashion staple. *See* India Roby, *Cargo Pants Are Going to be Everywhere This Fall*, Nylon (Aug. 8, 2021), https://www.nylon.com/fashion/cargo-pants-trend-fall-2021; https://perma.cc/CC2M-3693; Oscar Hartzog, *10 Pairs of Musician-Inspired Cargo Pants to Wear Right Now*, Rolling Stone, (Feb. 22, 2021 5:18 PM), https://www.rollingstone.com/product-recommendations/lifestyle/best-cargo-pants-for-men-1128228/; https://perma.cc/JBD5-MXGR; Avidan Grossman, *The 18 Best Cargo Pants to Wear Right Now*, Esquire, (Nov. 3, 2020), https://www.esquire.com/style/mens-fashion/g34554667/best-cargo-pants/; https://perma.cc/2NGA-7MJD.

[10] The two officers who participated in Mr. Bingman's arrest were part of a larger group of officers who responded to the scene, although the record does not reflect how many officers were present. *Cf. Germany*, 984 A.2d at 1230 (explaining that occupants outnumbering officers contributed to reasonable, articulable suspicion that one of them might be armed and presently dangerous).

In sum, according to the evidence presented by the government, at the time the police searched Mr. Bingman for weapons, they only knew the following: [11] a judge had issued a search warrant for an alleged marijuana pop-up party with no information about weapons being present; the multiple warehouse doors at the target location were all wide open; and Mr. Bingman—who was wearing a graphic t-shirt and pants with lots of pockets and had some sort of knife hanging off his belt in plain view—had cordially approached them, and did not resist when they seized him or the knife. Because the totality of this information did not reasonably signal to the police that Mr. Bingman was working as a security guard, much less give the police sufficient cause to believe he was armed and dangerous, we conclude that *Terry* patdown of Mr. Bingman for weapons violated the Fourth Amendment. Accordingly, we vacate Mr. Bingman's convictions and remand for further proceedings consistent with this opinion.

*So Ordered.*

---

[11] The dissent highlights the fact that the police in fact recovered a "semi-automatic pistol, ammunition, and two large capacity magazines" from Mr. Bingman. *Post* at 12. But "a search is not to be made legal by what it turns up"; rather, "it is good or bad when it starts and does not change character from its success." *United States v Di Re*, 332 U.S. 581, 595 (1948).

FISHER, *Senior Judge*, dissenting: This case no doubt would have been easier if the government had produced more evidence describing the sheath knife worn by appellant and detailing the experience of the officers who testified. Nevertheless, the existing record demonstrates that the officers acted reasonably, and we should affirm the order of the trial court denying appellant's motion to suppress the semi-automatic pistol, ammunition, and two large capacity magazines they found on his person.

The majority correctly assumes that the officers had grounds to briefly detain appellant when he emerged from the warehouse they were about to search. *See Michigan v. Summers,* 452 U.S. 692 (1981). Of course, the right to detain does not confer a right to frisk, but the Supreme Court recognized long ago that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry v. Ohio*, 392 U.S. 1, 23 (1968). In some circumstances, therefore, the Fourth Amendment permits a limited protective search for weapons. *Id*. at 29. When an officer conducting a *Terry* stop "has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Adams v. Williams*, 407 U.S. 143, 146 (1972) (citing *Terry*, 392 U.S. at 30).

Appellant *was* armed and dangerous when the officers first encountered him. As police officers approached the location they were about to search, appellant emerged onto a loading dock and greeted them. The officers saw that he was wearing "a sheathed knife on his waist" in plain view. Recognizing that the knife "could be a potential threat or danger," they removed it from the sheath. Officer Javelle explained that he "removed that weapon to take it out of anything that could happen if my partner lost control of him or anything of that nature." Appellant had not reached for the knife, nor does the record establish that it was a prohibited weapon, but its presence posed a danger whether or not appellant possessed it illegally.[1] *See Adams v. Williams*, 407 U.S. at 146 ("[A] frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law.").

---

[1] The record does not contain a photograph of the knife, and the officers did not describe its shape or dimensions, but the BWC footage shows that the sheath that held it was at least a few inches long. This clearly was not a "simple" or "typical folding knife," like that discussed in *Maye v. United States*, 260 A.3d 638 (D.C. 2021). Moreover, the surrounding circumstances were much different in *Maye* and the threshold issue there was whether the police had a lawful basis for detaining the defendant. Here, we start from the premise that the officers had grounds to briefly detain appellant—in other words, to conduct a *Terry* stop.

Removing the knife was an entirely reasonable precaution "to allow the officer[s] to pursue [their] investigation without fear of violence," *see id*., but neutralizing that particular source of danger did not make the knife irrelevant. The fact that appellant was carrying and displaying such a weapon remains a part of "the totality of the circumstances—the whole picture"—that we must take into account. *See United States v. Cortez*, 449 U.S. 411, 417 (1981). And the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id*. at 418.

The whole picture reveals that the officers knew they were entering a dangerous situation—a type of "flea market" where drugs and drug paraphernalia were being sold illegally. As Officer Hopper testified, "Usually, when these type of illegal events take place, it's not uncommon for there to be firearms or . . . some form of weapon to be on scene as a means of defense or protection of the illegal substance, or monies from the sale of the illegal substance." This was not an idiosyncratic experience. *See, e.g., Peay v. United States*, 597 A.2d 1318, 1321 (D.C. 1991) (en banc) ("[A]s has been often observed, drugs and weapons go together."). Appellant emphasizes that the warrant did not authorize the officers to search for weapons. But that was also true in *Stanley v. United States*, 6 A.3d 270 (D.C. 2010), where the defendant was present when a warrant to search for drugs

was being executed. We rejected a similar challenge to the lawfulness of a protective search "in light of our recognition, and the recognition of courts around the country, that drugs and weapons are often found together." *Id*. at 275.

Here the officers could see that appellant was armed, and under the totality of the circumstances they were not obliged to assume that the knife was the only weapon he was carrying. As Officer Javelle explained, "we've done a few pop-up warrants by that point, and we found that most of those events have some type of security; usually unofficial security, not necessarily licensed security guards or anybody actually employed by a security company. And we found weapons on multiple occasions, so once I found the knife, we definitely had to look for more weapons . . . ."[2]

Appellant's attire added to their legitimate concern. He was not wearing jeans or slacks, but baggy pants with capacious pockets, the type often worn by soldiers and police officers. One officer testified that "[w]e used to have the same pants, with . . . the big pockets on the sides . . . the big pockets to store items in." Indeed,

---

[2] The trial court found that "the observation of a knife" gave "some particularized suspicion that could cause the officers to have some concern that there is some safety issue . . . that would justify the pat down."

it appears from the BWC footage that the two officers who detained appellant were wearing similar pants (of a different color). In this setting, big pockets within easy reach properly heightened the officers' concern.

When patting down the left pocket of appellant's cargo pants, Officer Hopper found a magazine containing ammunition. In light of that discovery, there was, in the officer's "professional opinion . . . a likelihood he might have had a firearm on his person." The firearm was found in appellant's waistband.

As it turns out, comparing appellant's attire to a battle dress "uniform" created a distraction. The point is not that appellant was garbed with indicia of official status (why would the operators of an illegal enterprise do that?) but rather that appellant had chosen clothing that would be useful for someone who was providing security at such an event and wanted to have weapons readily accessible. I certainly do not suggest that everyone who wears cargo pants must be armed and dangerous, but appellant's attire was part of the whole picture that we must take into account.

We also should view "the facts and all reasonable inferences therefrom . . . in favor of sustaining the trial court's ruling." *Germany v. United States*, 984 A.2d 1217, 1221 (D.C. 2009) (internal quotation marks omitted). We review de novo the

ultimate question of whether the police violated the Fourth Amendment, but in doing so we must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *see also Terry*, 392 U.S. at 27 ("[D]ue weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.").

In this case, the officers acted prudently and reasonably. *See Terry*, 392 U.S. at 27 ("[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). We should affirm the trial court's decision denying appellant's motion to suppress.